**FILED**
**Dec 05, 2023**
**09:50 AM(ET)**
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



# TENNESSE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT MURFREESBORO

| | | |
|---|---|---|
| **DESTINY DYER,** | ) | **Docket No.: 2023-05-00917** |
| **Employee,** | ) | |
| **v.** | ) | |
| **PETSMART, INC.,** | ) | **State File No.: 50156-2022** |
| **Employer,** | ) | |
| **And** | ) | |
| **IDEM. INS. CO. OF N. AM.,** | ) | **Judge Thomas Wyatt** |
| **Insurance Carrier.** | ) | |
| | ) | |

---

## REVISED EXPEDITED HEARING ORDER FOR MEDICAL BENEFITS

---

In this expedited hearing, Destiny Dyer sought surgery that PetSmart, Inc. failed to authorize for a herniated cervical disc. PetSmart argued Ms. Dyer did not give timely notice of a neck injury, which Ms. Dyer denied. Further, the parties disputed the mechanism of the injury, and the medical proof conflicted on the issue of causation of the herniated disc.

For the reasons below, the Court orders PetSmart to authorize the surgery.

### History of Claim

Ms. Dyer has worked at PetSmart more than four years. She worked as a groomer at the time of her injury but now is a cashier because of limitations due to her injury. No evidence suggested that, before her injury, she had experienced neck, left-shoulder, or left-arm symptoms.

In June of 2022, as Ms. Dyer trimmed the nails of a large dog, it suddenly jerked the paw she was trimming. She maintained her grip on the paw, and the dog yanked her left arm backward while spinning her to the left. During the incident, she claimed to have raised from her bent position and struck an overhead bar with her head.

1

She experienced left shoulder and arm pain after the accident and reported it to PetSmart's store leader, Bradley Deselle, that same day. She told him that she hit her head but declined medical attention because she was not dizzy and did not think she had a concussion. Mr. Deselle waited to see how the injury progressed before completing an incident report.

Ms. Dyer continued working in the days afterward but experienced persistent left-shoulder and upper arm pain. She requested medical attention thirteen days later. Mr. Deselle completed an incident report, writing that Ms. Dyer "was clipping nails when a [large] dog kicked [its] leg and [she] heard a pop in her shoulder." He added that Ms. Dyer did not "think much" of the injury at first but decided to file a written report because "it has not gotten any better." He testified that he did not remember Ms. Dyer telling him about hitting her head.

PetSmart accepted Ms. Dyer's injury. Mr. Deselle referred her to a telehealth nurse, who wrote that Ms. Dyer "was holding [a French mastiff's] paw, and the dog yanked its paw, causing her left shoulder to be yanked also."

PetSmart next referred her to an urgent care clinic, where a physician noted that "[the patient] was trimming a mastiff's nails. The dog lunged and pulled [patient's] shoulder[.]" He wrote that Ms. Dyer described her shoulder pain as "aching and sharp" and diagnosed a strain of the left shoulder, upper arm, and trapezius.

On a later visit to the urgent care, Ms. Dyer added a report of constant, aching, and sharp pain in her neck.[1] On her final visit, the treating physician added Ms. Dyer's report of left-shoulder numbness and tingling. He referred her for orthopedic care.

Ms. Dyer selected Dr. Roderick Vaughan from a panel and saw him on September 12. He noted that a mastiff yanked her left arm and pulled and twisted it backward. She reported left-sided radiating pain from her shoulder to her forearm and tingling in her fingers. An MRI of the left shoulder and nerve testing of the left upper extremity showed normal findings. He recommended she see a pain management specialist, and PetSmart offered her a panel of physicians.

Ms. Dyer selected Dr. Jeffrey Hazlewood. He is board certified in physical and rehabilitation medicine and pain management and has practiced more than thirty years.

Ms. Dyer saw Dr. Hazlewood twice. She testified that at the first visit on October 24, he spent more time with her in taking her history than did the physicians she saw

---

[1] In responses to requests for admission, Ms. Dyer stated that she did not report neck pain until she saw Dr. Hazlewood, but this notation shows an earlier report of neck pain.

previously. Dr. Hazlewood reported that Ms. Dyer gave a reliable presentation of her injury and history.

He wrote that a "dog pulled down her arm on the left in a hyperextended position and yanked it, pulling her forward." He added that Ms. Dyer smacked her head against a bar and suffered a whiplash of the head. On examination, he noted left-shoulder pain, shooting pain into the left upper extremity, numbness, tingling, and vibrating sensations throughout her left upper extremity, and left-upper-extremity weakness.

He ordered an MRI of the neck and another nerve test. The testing showed a large, left-sided herniated disc at the C6-7 level with C7 radiculopathy. He concluded the condition was work-related. He later referred Ms. Dyer to neurosurgeon Dr. George Lien, and PetSmart authorized treatment with him.

Dr. Lien has practiced as a board certified neurosurgeon for thirty years. He saw Ms. Dyer once, in December 2022, and noted her report of injury when knocked over by a dog that she was grooming. The dog jerked her left arm, and she struck her back and shoulder area. He recommended fusion surgery because conservative care over several months was unsuccessful.

During treatment, PetSmart questioned the causation of Ms. Dyer's neck injury. Dr. Hazlewood reviewed Ms. Dyer's records and changed his initial causation opinion because none of the reports he reviewed included a history that she hit her head. In his deposition, he explained his changed causation opinion. He concluded that Ms. Dyer changed her story about hitting her head during the grooming accident and may have lied about that detail. He answered positively when asked if persons diagnosed with a borderline personality disorder lie under certain circumstances. Dr. Hazlewood reconsidered the mechanism of injury that Ms. Dyer described. He concluded that if she did not hit her head, the trauma she described was insufficient to cause a herniated cervical disc.

Based on Dr. Hazlewood's revised causation opinion, PetSmart denied the surgery recommended by Dr. Lien. The fact that Dr. Lien disagreed with Dr. Hazlewood's causation opinion did not change the denial.

PetSmart asserted it had no notice that Ms. Dyer hit her head until four months after the date of injury. The adjuster testified that he would have reviewed video evidence of Ms. Dyer's injury at the beginning of the case had he known that she hit her head. In fact, he asked for the video after receiving Dr. Hazlewood's report, but it had been erased.[2] PetSmart claimed that its right to investigate this claim was irreparably prejudiced due to these circumstances.

---

[2] PetSmart did not introduce evidence as to when the video was erased.

As to causation, PetSmart argued the failure of Mr. Deselle and several treatment sources to note that Ms. Dyer hit her head meant that it did not happen. PetSmart relied on Dr. Hazlewood's revised causation opinion that the trauma of the dog jerking Ms. Dyer's arm was insufficient to have herniated her C6-7 disc unless she also hit her head.

For her part, Ms. Dyer testified consistently that the dog she was grooming twisted her arm, spun her around, and she hit her head on the overhead bar. She claimed she consistently reported that she hit her head when describing her injury.

Ms. Dyer also testified that she was diagnosed with borderline personality disorder, depression, and anxiety during her mid-teen years. She was hospitalized for a week for these conditions. She discontinued medication and counseling after both worsened her conditions. She continues to experience mental-related symptoms but manages them by understanding her symptoms, keeping active, and surrounding herself with happy people. She denied that her borderline personality disorder causes her to lie. She patiently, calmly, and openly responded to vigorous cross-examination about her mental health history.

On the issue of her credibility, Mr. Deselle testified that he considers Ms. Dyer a good and honest employee. He assigns her to work in a position handling money. Ms. Dyer generally testified consistently while on the stand, but PetSmart did establish that she drinks alcohol from time to time despite denying that fact in her deposition.

Ms. Dyer relied on Dr. Lien's deposition testimony on the issue of causation. He concluded that the mechanism of the dog jerking her left arm, standing alone, provided more than fifty percent of the causation of her herniated cervical disc and its need for surgery. He added that the fact Ms. Dyer sought treatment shortly after the grooming incident supported his causation conclusion.

He disagreed with Dr. Hazlewood's opinion that the trauma of the grooming incident was insufficient to herniate Ms. Dyer's C6-7 disc unless she hit her head on the metal bar. He explained that the head acts like a pendulum when sudden force is applied to the neck. He often sees herniated cervical discs in vehicular collisions where the head does not strike anything.

Dr. Lien also disagreed with Dr. Hazlewood's testimony that upper extremity weakness occurs within a month after a herniated cervical disc. He explained that upper extremity weakness is caused by a herniated cervical disc impinging a nerve over time. While pain from the herniated disc occurs near in time to the causative trauma, weakness will develop later. In addition, Dr. Lien testified the fact that Ms. Dyer's first nerve test was negative did not show the absence of a herniated disc when the test was performed. He often sees clear MRI evidence of a herniated disc in cases where nerve testing is normal.

4

PetSmart relied on Dr. Hazlewood, who testified that several factors led him to change his causation opinion. First, the reports predating his involvement did not note that Ms. Dyer reported hitting her head at the time of injury. This caused him to doubt the reliability of the history she gave him, and he stated that reliability is a key factor to assessing causation. A second factor was her borderline personality disorder, which could cause her to be untruthful. Third, he stated that most diagnoses of herniated cervical discs are unaccompanied by a history of a causative traumatic event.

In support of his causation opinion, Dr. Hazlewood testified that, without striking her head on something, the mechanism of injury described by Ms. Dyer would not have caused a herniated cervical disc. He also stated that, if she had suffered a herniated disc in the described work incident, she should have developed upper extremity weakness within three or four weeks. He noted that none of the examiners who saw her during that time noted weakness on examination.

## Findings of Fact and Conclusions of Law

In this expedited hearing, Ms. Dyer must show that she will likely prevail at trial in proving her entitlement to the requested surgery. Tenn. Code Ann. § 50-6-239(d)(1) (2023). Specifically, she must carry this evidentiary burden in establishing that she gave PetSmart timely notice and that her injury arose primarily out of and in the course and scope of employment.

### *Notice*

The Workers' Compensation Law requires that an employee give notice of a work injury within fifteen days after its occurrence. This notice must state "the time, place, nature, and cause of the *accident resulting in injury*[.]" Tenn. Code Ann. § 50-6-201(a)(1)-(2). (Emphasis added.)

Here, PetSmart's store leader confirmed that Ms. Dyer gave him verbal notice of her work accident the day it occurred. Later, within fifteen days of the date of injury, he completed an incident report documenting the date, time, place, and a description of Ms. Dyer's accident. Though the report described how the dog yanked and pulled Ms. Dyer's arm, it did not state that she hit her head during the accident. Ms. Dyer testified she told Mr. Deselle that she hit her head. He testified that he did not recall her giving him that detail.

PetSmart argued that Ms. Dyer's notice was defective because, had it known she hit her head, it would have reviewed video surveillance of the incident before it was erased. Thus, it claimed, the delay in receiving notice that Ms. Dyer hit her head prejudiced its right to investigate her claim.

5

The Court holds that Ms. Dyer will likely prevail at trial in showing she gave timely notice of her accident and that she hit her head. The incident report shows that Ms. Dyer gave PetSmart timely notice of the time, place, nature, and cause of the accident. As to whether Ms. Dyer told the store leader that she hit her head, the Court finds credible her testimony that she timely communicated that detail to the store leader.

In support of the above finding, the Court observed Ms. Dyer's testimony during the expedited hearing. She testified calmly, patiently, openly, and confidently about the details of her accident, including under thorough cross-examination. She further testified candidly about the sensitive subject of her mental health history. *See Kelley v. Kelley,* 445 S.W.3d 685, 694-695 (Tenn. 2014) (discussing indicia of witness credibility.) In further corroboration of her reputation for honesty, PetSmart's store manager testified that she was a good and honest employee. He showed his confidence in her honesty by assigning her to work in a position handling money.

*Causation*

To receive benefits, an employee must show that a condition and need for treatment arises primarily out of and in the course and scope of employment. Proving causation requires expert medical testimony that the employment caused more than fifty percent of the alleged condition and need for treatment, considering all causes. The causation opinion of a treating physician selected from a panel is presumed correct but is rebuttable. Tenn. Code Ann. § 50-6-102(12)(A)-(E).

Here, the issue is whether Dr. Lien's favorable opinion or Dr. Hazlewood's unfavorable one better explains the causation of Ms. Dyer's herniated cervical disc. To decide, the Court reviewed the qualifications of the physicians, the circumstances of their examinations, and the information available to them in formulating their opinions. These weigh against the presumption in favor of Dr. Hazlewood's opinion. *Lentz v. Coca-Cola Consol., Inc.,* 2023 TN Wrk. Comp. App. Bd. LEXIS 34, at *10 (July 19, 2023).

Nothing about Drs. Lien's and Hazlewood's qualifications places one over the other. Both are qualified physicians with experience relative to the central issue. The fact that Dr. Hazlewood saw Ms. Dyer twice, while Dr. Lien saw her once, is not an important distinction. Both physicians had access to the same information in considering their causation opinions.

The distinction between their opinions rests in the factors each felt important in deciding causation. Dr. Lien gave two reasons for assigning more than fifty percent causation of Ms. Dyer's herniated cervical disc to her dog-grooming accident. He said, first, that even without striking her head, the trauma of the dog jerking her arm was sufficient to herniate her C6-7 disc; and secondly, she began seeking treatment for

6

symptoms for a cervical injury shortly after she sustained and reported being injured in the dog-grooming accident.

Dr. Hazlewood initially concluded that Ms. Dyer's work accident caused her neck injury. He changed his opinion upon learning that only he recorded a history that she hit her head when injured. Since the other physicians did not record that Ms. Dyer hit her head, Dr. Hazlewood assumed that Ms. Dyer untruthfully changed that detail of her history when speaking to him. He then removed the impact to the head from his causation analysis and concluded that the trauma of the dog jerking her arm was insufficient to herniate a cervical disc.

The Court assigns little weight to Dr. Hazlewood's opinion because essential elements of his analysis—that Ms. Dyer did not hit her head at the time of her accident and changed her story to say that she did—are speculative. Dr. Hazlewood's comment that persons diagnosed with borderline personality disorders may lie is unpersuasive for several reasons. First, he did not support his comment with specific medical evidence. Second, even if persons with borderline personality disorder may have a propensity to lie, that fact, standing alone, does not mean that Ms. Dyer lied about hitting her head. The person who testified who knew Ms. Dyer best, her store leader Mr. Deselle, testified that Ms. Dyer is an honest employee. Third, Ms. Dyer had no reason to change her story about hitting her head because, when she gave that history, her case was accepted as compensable. She could not have then known that Dr. Hazlewood would later diagnose a disc injury and assign importance to the detail about hitting her head.

Additionally, the Court gives greater weight to Dr. Lien's opinion that the trauma of the dog-grooming accident, even if Ms. Dyer did not hit her head, caused her herniated cervical disc. The medical records introduced into evidence showed that, within two to three weeks after the dog-grooming accident, she sought treatment for shoulder and arm pain. Within another week or two, she presented with neck pain, and a short time later she reported radicular symptoms in her upper extremity. This presentation of symptoms in the weeks after Ms. Dyer's accident at PetSmart supports Dr. Lien's causation opinion over Dr. Hazlewood's.

The Court must also consider Ms. Dyer's testimony in the causation analysis. The Supreme Court has consistently held that an employee's assessment as to his or her own physical condition "is competent testimony that is not to be disregarded." *Limberakis v. Pro-Tech Sec., Inc.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 53, at *6 (Sept. 12, 2017). The Court finds credible Ms. Dyer's testimony that she hit her head during the accident and reported that detail when she described her injury. The Court bases this finding on the credibility factors discussed above.

Further, other than not including that Ms. Dyer reported hitting her head, the histories recorded by Mr. Deselle and the medical personnel are consistent with her

7

testimony and support her credibility. The omission from those reports that she hit her head does not necessarily lead to the conclusion that she did not report that detail. The detail about hitting her head may not have been recorded because Ms. Dyer's primary complaints were shoulder and arm pain. Dr. Hazlewood may have noted that Ms. Dyer hit her head when the other historians did not because, as Ms. Dyer testified, he took far more time in taking her history. A comparison of the histories clearly shows Dr. Hazlewood's is far more detailed than the others.

As to Dr. Hazlewood's causation opinion, it is rebuttably presumed correct. However, his change of opinion based on his personal, factual conclusion that Ms. Dyer changed her story about hitting her head raises serious questions about the validity of his opinion. At trial, the Court must weigh credibility, and as noted above Ms. Dyer has been found credible. Also, no evidence showed that Ms. Dyer experienced neck, shoulder, or arm symptoms before the accident at PetSmart. Therefore, based upon the logic and reasoning of Dr. Lien's opinion, the Court holds that his opinion that Ms. Dyer's neck injury is work-related, with her credible testimony, rebuts Dr. Hazlewood's unfavorable causation opinion by a preponderance of the evidence.

For these reasons, the Court holds that Ms. Dyer will likely prevail at trial in proving that her herniated cervical disc arose primarily out of and in the course and scope of employment.

**IT IS, THEREFORE, ORDERED** as follows:

1. The Court withdraws its original order because of error and enters this order in substitution for the original order.

2. PetSmart shall authorize Dr. Lien to perform the prescribed surgery. It shall promptly take the necessary steps to schedule the surgery.

3. This case is set for a Status Hearing **at 9:00 a.m. Central Time/10:00a.m. Eastern Time on March 27, 2024**. You must call (615) 741-3061 or toll-free at (855) 747-1721 to participate in the Status Hearing. You must call on the scheduled date/time to participate. Failure to call in may result in a determination of the issues without your further participation.

4. **Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after**

8

**entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.**

5. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email WCCompliance.Program@tn.gov.

**ENTERED December 5, 2023.**

*Thomas Wyatt*

**Judge Thomas Wyatt**
**Court of Workers' Compensation Claims**

## APPENDIX

Exhibits:

1. Affidavit of Destiny Dyer
2. C-42 selecting Dr. Roderick Vaughan
3. C-42 selecting Dr. Jeffrey Hazlewood
4. PetSmart incident report
5. Telehealth Consultation Report
6. Responses to Employer's First Requests for Admissions
7. Responses to Employer's First Set of Interrogatories
8. Photographs (collective A-F)
9. Medical Records
   - CareNow Urgent Care
   - Dr. Roderick Vaughan
   - Maury Regional Medical Center
   - Dr. Jeffrey Hazlewood
   - Results Physiotherapy
   - Dr. George Lien
10. Transcript of the deposition of Dr. Hazlewood
11. Transcript of the deposition of Dr. Lien
12. Photograph (identification only-sustained relevance objection)
13. Wage Statement
14. Intake sheet
15. Page 13 of the deposition of Destiny Dyer

Technical record:

1. Petition for Benefit Determination
2. Dispute Certification Notice and statement of additional issues
3. Request for Expedited Hearing
4. Motion to Present Testimony by Videoconference
5. Order allowing testimony by videoconference
6. Employer's Pre-Hearing Statement
7. Employer's Witness and Exhibit List
8. Employee's Pretrial Brief
9. Employee's Witness List
10. Transfer Order

## CERTIFICATE OF SERVICE

I certify that a copy of the Order was sent as indicated on December 5, 2023.

| Name | Email | Service sent to: |
| --- | --- | --- |
| Cindy E. (Harris) Harlow<br>Employee's Attorney | X | cindy@flexerlaw.com<br>meredith@flexerlaw.com |
| Allen Grant<br>Benjamin T. Norris<br>Employer's Attorneys | X | agrant@eraclides.com<br>bnorris@eraclides.com |

**Penny Shrum, Court Clerk**
Wc.courtclerk@tn.gov

11



<u>Expedited Hearing Order Right to Appeal:</u>

If you disagree with this Expedited Hearing Order, you may appeal to the Workers' Compensation Appeals Board. To appeal an expedited hearing order, you must:

1. Complete the enclosed form entitled: "Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within seven business days* of the date the expedited hearing order was filed. When filing the Notice of Appeal, you must serve a copy upon all parties.

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of the appeal.**

3. You bear the responsibility of ensuring a complete record on appeal. You may request from the court clerk the audio recording of the hearing for a $25.00 fee. If a transcript of the proceedings is to be filed, a licensed court reporter must prepare the transcript and file it with the court clerk *within ten business days* of the filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within ten business days* of the filing of the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the hearing. The Workers' Compensation Judge must approve the statement before the record is submitted to the Appeals Board. If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. If you wish to file a position statement, you must file it with the court clerk within *ten business days* after the deadline to file a transcript or statement of the evidence. The party opposing the appeal may file a response with the court clerk *within ten business days* after you file your position statement. All position statements should include: (1) a statement summarizing the facts of the case from the evidence admitted during the expedited hearing; (2) a statement summarizing the disposition of the case as a result of the expedited hearing; (3) a statement of the issue(s) presented for review; and (4) an argument, citing appropriate statutes, case law, or other authority.

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL
Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

Docket No.: _____

State File No.: _____

Date of Injury: _____

**Employee** _____

v.

**Employer** _____

Notice is given that _____

*[List name(s) of all appealing party(ies). Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____   ☐ Motion Order filed on _____

☐ Compensation Order filed on_____   ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal
Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

## Parties
**Appellant(s) (Requesting Party):** _____   ☐Employer☐Employee

Address: _____   Phone: _____

Email: _____

Attorney's Name: _____   BPR#: _____

Attorney's Email: _____   Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee
Appellee's Address: _____ Phone: _____
Email: _____
Attorney's Name: _____ BPR#: _____
Attorney's Email: _____ Phone: _____
Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a
true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described
in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this
case on this the _____ day of _____, 20 _____.


_____
*[Signature of appellant or attorney for appellant]*



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name:_____  2. Address: _____

3. Telephone Number: _____  4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning | _____ |
| SSI | $ _____ per month | beginning | _____ |
| Retirement | $ _____ per month | beginning | _____ |
| Disability | $ _____ per month | beginning | _____ |
| Unemployment | $ _____ per month | beginning | _____ |
| Worker's Comp. | $ _____ per month | beginning | _____ |
| Other | $ _____ per month | beginning | _____ |

LB-1108 (REV 11/15)                                                      RDA 11082

9. My expenses are:

Rent/House Payment $ _____ per month    Medical/Dental  $ _____ per month

Groceries          $ _____ per month    Telephone      $ _____ per month

Electricity        $ _____ per month    School Supplies $ _____ per month

Water              $ _____ per month    Clothing       $ _____ per month

Gas                $ _____ per month    Child Care     $ _____ per month

Transportation     $ _____ per month    Child Support  $ _____ per month

Car                $ _____ per month

Other              $ _____ per month (describe: _____ )

10. Assets:

Automobile              $ _____    (FMV) _____

Checking/Savings Acct.  $ _____

House                   $ _____    (FMV) _____

Other                   $ _____    Describe: _____

11. My debts are:

Amount Owed                          To Whom

_____    _____

_____    _____

_____    _____

_____    _____

I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.

_____
APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____
NOTARY PUBLIC

My Commission Expires: _____

LB-1108 (REV 11/15)                                    RDA 11082